UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLES FOWLER-SCHOLZ

Petitioner,

v.

HUNTER ANGELEA,

Respondent.

No.  2:19-cv-2164 TLN DB

FINDINGS AND RECOMMENDATIONS

Petitioner, a state prisoner, proceeds pro se and in forma pauperis with a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges a judgment of convictions entered on June 16, 2016 in the Sacramento County Superior Court. (ECF No. 17-1.) Petitioner stands convicted of two counts of second-degree murder, one count of attempted murder in second-degree, one count of assault with a firearm, and one count of assault with a deadly weapon. Petitioner claims that there was insufficient evidence to convict him of aiding and abetting his codefendant. (ECF No. 1 at 4.) For the reasons set forth below, it is recommended that the petition be denied.

## BACKGROUND

I.    **Facts Established at Trial**

The California Court of Appeal for the Third Appellate District provided the following summary of the facts presented at trial:

1

Surveillance cameras stationed at multiple vantage points inside the sports bar recorded the events of defendants' night from when they arrived at the sports bar until the shooting. The video, which is in black and white, shows defendants arriving at the sports bar at 8:34 p.m. with Fowler-Scholz's wife, Amber Scholz,[] and two black men. Fowler-Scholz wore a baggy white sweatshirt with a darker shirt hanging out from the bottom. Montoya wore a gray baggy sweatshirt and had the hood up upon entering the bar. The other male members of defendants' group also wore baggy clothing -- one a large dark jacket with a fur-lined hood and the other a baggy gray sweatshirt. Amber wore a neutral-colored sweater and carried a purse. The entire group wore jeans. Upon arriving, the group immediately ordered drinks from a temporary drink station set up at the back of the bar to accommodate the holiday crowd.

For the next hour, the group stood together near the temporary drink station and talked amongst themselves and with other patrons or employees, with Fowler-Scholz doing a majority of the talking. They frequented the temporary drink station, ordering beers and shots of liquor. Fowler-Scholz also bought drinks for people not with his group and can be seen giving high fives to multiple people and employees throughout the bar. During one such order at 9:19 p.m., Fowler-Scholz lifted his sweatshirt and shirt to show the bartender a tattoo covering his stomach. The tattoo is in large Old English script and reads "SACRA." Fowler-Scholz showed the tattoo for no longer than two seconds before lowering his sweatshirt. After showing the tattoo, Fowler-Scholz and other members of his group started dancing.

Over the course of the next 20 minutes, Fowler-Scholz lifted his sweatshirt in the same fashion as he did to the bartender and showed his tattoo twice to the people in his group and two other times to the man in his group wearing the gray sweatshirt who was not Montoya. At 9:42 p.m., Fowler-Scholz and Montoya went outside through the front door of the bar to smoke a cigarette and talked with Daniel Ferrier, the security guard stationed at the front door checking patrons' identifications. Amber also left the bar but out the side door where the bathrooms were located. A few minutes later, the man in the fur-lined jacket left out the side door, leaving only the man in the gray sweatshirt near the temporary drink station.

At 9:44 p.m., on her way back from the bathroom, Amber walked past Gabriel Cordova and he bumped into her spilling his drink on her sweater. After the spill, Cordova and Amber talked and Cordova apologized and offered to buy Amber a drink, but Amber walked away "pretty upset." She walked over to the temporary drink station where Fowler-Scholz and Montoya met up with her after returning from outside. Amber can be seen on the surveillance footage talking to Fowler-Scholz while gesturing to the areas of her sweater where Cordova spilled his drink. Fowler-Scholz grabbed a bottle of beer and then the group, without the man in the fur-lined jacket, walked in a single file line to the front of the bar.

When the group arrived at Cordova's location at the front of the bar, Amber pushed her way to the front of the group and pointed to

2

Cordova saying "that [i]s the guy." Fowler-Scholz and Montoya approached Cordova; Amber and the man in the gray sweatshirt moved in behind them. Cordova's friend, Manuel Gutierrez, moved closer to Cordova and a scrum formed from the two groups. Fowler-Scholz accused Cordova of "disrespect[ing] my woman" and Cordova tried to explain what happened from his point of view. Fowler-Scholz seemed upset, angry, and looking for a fight. He told Cordova to step outside but Cordova refused.

Montoya stepped toward Cordova and said something to him, at which point Ferrier walked toward the group from his position by the front door. Before he could get there, Fowler-Scholz threw the beer bottle he was holding at Cordova's head. The bottle hit him. Fowler-Scholz then bear-hugged Cordova and the two wrestled around the hallway between the permanent bar and the front door of the sports bar.

Right after Fowler-Scholz hit Cordova with the beer bottle, Amber walked out of the bar and Montoya reached into his waistband and pulled out a gun. Ferrier and Gutierrez attempted to break up the fight. Ferrier tried to get at the fighting men by pushing Montoya aside. When he touched Montoya's left arm, Montoya pointed the gun at Ferrier's head and fired within four feet of him. Ferrier immediately went limp and fell to the ground. He was hit four times in the head, three of which traveled through his brain killing him.

Upon hearing gun shots, everyone in the bar scrambled away from defendants. Montoya put the gun back in his waistband and walked toward Fowler-Scholz who was lying on the ground and on top of Cordova and Ferrier. Before he could get there, Stephen Walton, a security officer, came into the bar from a door located next to where the shooting occurred. Walton saw Montoya standing over bodies and grabbed Montoya's left shoulder. Montoya reached for his gun causing Walton to back into the doorway he had just entered through. Montoya shot at Walton two or three times, hitting him twice in the abdomen.

Montoya then put his hood up and the gun back in his waistband before trying to pull Fowler-Scholz onto his feet. Christina Cordova, [] Cordova's wife, walked into the hall to check on her husband who was on the ground. Upon seeing Christina, Montoya pulled out his gun and fired at the ground one or two times hitting Christina in the foot before putting his gun back in his waistband. Montoya then continued trying to pull Fowler-Scholz off the ground. Walton entered the bar again through the door he had retreated through and shot at Montoya, hitting him in the jaw. After being hit, Montoya walked out the front door of the bar followed by a stumbling Fowler-Scholz.

Officers responded nearly immediately and tended to Cordova who had been shot three times on the side of his torso. They attempted to resuscitate him, but Cordova died from his injuries. Montoya was arrested outside of the bar within minutes of fleeing; his blood-alcohol level was 0.18. He was not wearing any red clothing, but a nine-millimeter handgun was taken from his possession. Fowler-Scholz's blood-alcohol level was .17.

(ECF No. 17-5 at 4–7; People v. Montoya, No. C082283, 2019 WL 2353014, at *2–4 (Cal. Ct. App. June 4, 2019).)

The California Court of Appeal also summarized gang-related facts presented by the prosecution at trial:

A

*Fowler-Scholz And The Varrio Diamond Sacra Subset*

Detective Sample testified again for the prosecution as an expert of Sacramento street gangs and expanded upon the testimony he offered at the preliminary hearing. In Sacramento there are two Hispanic gangs -- the Norteños and the Sureños who are rivals. Those gangs break down further into subsets. Norteños generally associate with the color red and anything to do with the north, the letter "N," or the number 14. The current trend is for gang members to wear subtle indicators of their gang membership, instead of wearing copious amounts of gang colors as was done in the past. There are certain cities that have come to represent the Norteño street gang, while other cities have come to represent the Sureño street gang. For example, Sacramento is known as one of the Norteño "strong holds" because it is the capital of California and a large Northern California city. It is common for Norteños to use the term Sacramento or the area code "916" to represent their gang affiliation. Sureño gang members similarly use Los Angeles as a symbol of their gang affiliation.

There are over a dozen Norteño subsets across Sacramento, including the Varrio Diamond Sacra subset. In addition to identifying with common Norteño symbols, the Diamond also associate with the number 17, because 17th Avenue runs through their turf, and the number 34, because a park in their territory is located on 34th Street. They also associate with anything having to do with the diamond shape. For example, the gang's hand signal is a diamond made by connecting two peace signs a person makes with his or her index and middle finger. The Diamond also use the symbol "VDS" for Varrio Diamond Sacra.

The primary activities of the Diamond is firearm possession, assaults with a firearm or other weapon, drive-by shootings, murder, narcotic sales of methamphetamine and marijuana, robbery, and vehicle theft. Detective Sample testified to three predicate offenses committed by Diamond gang members for the purpose of proving the gang is a criminal street gang within the meaning of the statute. The first

4

offense involved Oscar Gaspar, who was convicted of first degree murder in June 2013 after shooting someone his girlfriend told him sexually assaulted her. After the shooting, Gaspar and Fowler-Scholz texted with each other and Gaspar was later arrested at Fowler-Scholz's house for the murder. At the time of the offense, Gaspar was a well-known Varrio Diamond Sacra gang member, with multiple tattoos signifying his loyalty to the Diamond specifically, and one tattoo signifying his loyalty to the Norteños generally. Gaspar also admitted gang membership and officers found Diamond graffiti in his jail cell after he was arrested for the murder. Gaspar was also found communicating with other Norteño gang members in jail by passing a "kite," or a small note, that contained a list of reliable gang members currently in jail. Gaspar's moniker Grumpy appeared on the confiscated list.

The second predicate offense involved Andrew Martin, who was convicted of attempted murder with a gang enhancement in December 2010. Martin and another Varrio Diamond Sacra gang member were in a convenience store when they saw other Norteño gang members affiliated with a different Sacramento subset. Martin asked the other Norteño subset members where they were from and told them they were in Diamond territory. In the parking lot a short time later, Martin shot one of the other Norteño gang members in the stomach. At the time of the shooting, Martin had gang-related tattoos, including the number 17 with diamond shapes drawn into the numbers. He also admitted his gang membership and had associated with other Varrio Diamond Sacra gang members in the past.

The third predicate offense involved Fowler-Scholz's ex-girlfriend Reyna Viduya, who was convicted of possession of a stolen firearm. The conviction resulted from a car stop in August 2012, while Viduya rode in the back passenger seat of a car also occupied by Fowler-Scholz, Tonde Brown,[8] and Clifton Riddle after the group had been out drinking. Upon a search of the car, officers found a loaded gun under the front passenger seat where Fowler-Scholz had been sitting. Viduya claimed she "took the fall" for the gun by telling officers it was hers, when in fact she did not know who actually owned the gun. She did this because she did not want Fowler-Scholz to be held responsible in light of his criminal history. Viduya, however, told the prosecution's investigator that the gun belonged to Fowler-Scholz. In Detective Sample's opinion, Viduya was a Diamond gang member because she admitted four years of Norteño gang membership at the time of the offense and she was associating with Fowler-Scholz, a known Diamond gang member.

[N.8 Brown was a validated member of the 29th Street Garden Block Crips, a subset of an African American criminal street gang. The fact that a Crip gang member associated with Fowler-Scholz was relevant to Detective Sample because gang members generally "want to be around people [who are] gonna be trusted, [who] aren't gonna snitch, have loyalty, ideals, and gang members of African American gangs, Asian gangs, and Hispanic gangs are fairly similar in those ideals of not snitching, loyalty, respect, the same concepts apply in those other gangs also."]

Detective Sample also testified about the role of guns in gang life. According to him, "a firearm is pretty much a tool of the trade of a gang member. It's like a carpenter and hammer. It's how they conduct most of their business, their reputation for violence. It's one of the -- the best ways for them to get that violent point across. It's the most efficient way to carry out violence for them." Detective Sample continued by explaining that not all Norteño gang members would be expected to carry a weapon if in public with other Norteño gang members. But at least one of those gang members would likely be carrying a gun for the group. "[T]ypically the violence and the firearm is going to be delegated to a younger person [who is] trying to prove [himself or herself] into the gang or younger persons who necessarily don't have the same exposure to prison time ...."

In Detective Sample's opinion, Fowler-Scholz is an active Norteño gang member with specific loyalty to the Varrio Diamond Sacra subset. He based this opinion on Fowler-Scholz's tattoos, evidence recovered from his home, and his associations with other Diamond gang members. Fowler-Scholz's tattoos identified him as a Varrio Diamond and Norteño gang member. On his stomach was the term "SACRA" representing Sacramento and the Varrio Diamond Sacra subset. He also had the term "Norteño" tattooed on his back, "XIV" on his left leg, the number one on his right shoulder and the number four on his left shoulder, representing the number 14.

Upon a search of Fowler-Scholz's home, officers found a diamond-shaped red bandana hanging on the wall of his bedroom, which is a "proud symbol" of Diamond membership. Multiple other red bandanas were collected from the room along with multiple items of red clothing and a red beanie with a Huelga bird on it, which is a symbol associated with the Norteño gang. One red bandana was folded in a common folding pattern among Norteño gang members that makes it easier to fit the bandana in a pocket so that it can stick out for people to see.

Officers also found several photographs of Fowler-Scholz wherein he demonstrated his gang affiliation. In one photo of him and several people, everyone wore red clothing including Fowler-Scholz who also wore a Cincinnati Reds baseball cap. Another person in the photo wore a shirt with a Huelga bird on it. In a framed photo found on Fowler-Scholz's dresser, he is seen displaying his "SACRA" stomach tattoo. In a black photo album entitled "party time," officers found multiple other photographs of Fowler-Scholz displaying gang signs with other people. Also in the bedroom was a pillow that was solid red on the back and had "Norte XIV" stitched in red on the front. Officers also found other indicia of Norteño gang affiliation, including a keychain and a restaurant placard. In a kitchen cabinet, officers found a nylon gun holster; however, they did not find any guns or ammunition in the house.

Fowler-Scholz associated with known Varrio Diamond Sacra gang members, including Gaspar who Fowler-Scholz helped after Gaspar committed murder. This type of association showed a high level of trust between Fowler-Scholz and a Diamond gang member. Fowler-Scholz also lived in close proximity to the central territory of Varrio

Diamond Sacra and near crimes committed by other Diamond gang members.

B

*Montoya And The 27th Avenue Norteño Subset*

In Detective Sample's opinion Montoya is a member of the 27th Avenue Norteños in East Oakland. He based this opinion on Oakland Police Sergeant Douglass Keely's testimony about Montoya's gang contacts and the Norteño gang culture in Oakland, as well as additional evidence collected from defendants' house and Montoya's tattoos. In Oakland there are three Hispanic gangs -- the Norteños, Sureños, and Border Brothers -- each with several subsets. The Murder Dubs region of East Oakland is between 20th and 29th Avenues and contains multiple Norteño subsets, including the 27th Avenue Norteños. Norteños in Oakland associate with the color red and the number 14, which represents "N," the 14th letter of the alphabet. Many gang members in Oakland do not wear their gang colors prominently, but instead wear red as an accessory color. For example, many Norteño gang members will wear a red belt or red shoe laces and then "flash [their] power" at someone by showing off the red article of clothing. When they do that "you know what that person is telling you. You know, trouble is coming." Sergeant Keely has also seen gang members "flash [their] power" by flashing their gang-related tattoos. Generally, gang members want people to know who they are and who they are associated with, unless they are in another gang's territory.

Sergeant Keely also believed Montoya to be a member of the 27th Avenue Norteños. He and Detective Sample based this opinion on photographs of Montoya, Montoya's tattoos, and a 2006 police report. The 2006 police report described a fight between Montoya and a Sureño gang member when Montoya was in high school. The altercation began when the Sureño gang member drove past Montoya in a parking lot and yelled allegiance to the Sureño gang while displaying a Sureño gang sign. Montoya responded by flipping off the Sureño gang member. The next day, Montoya confronted the Sureño gang member about the reason he was targeted. Montoya punched the Sureño gang member, according to Montoya, after the Sureño gang member acted like he was going to punch Montoya. During the fight, the Sureño gang member's girlfriend called Montoya a "chap," which is a derogatory term for a Norteño gang member. At the time of the fight, Montoya denied being a gang member; however, he wore a red shirt and red and white shoes during the fight.

At the time of the current offenses, Montoya had a tattoo on his arm showing a warrior with a Mongolian haircut and a "2" and "7" in the face of the warrior. Mongolian warriors are symbols among Norteño gang members who are foot soldiers for the Nuestra Familia prison gang, and the "2" and "7" represent Montoya's subset of the 27th Avenue Norteños. After his arrest for the current offenses, Montoya got an additional tattoo of a single dot on one hand and four dots on the other -- representing the number 14.

7

In the photographs both Sergeant Keely and Detective Sample reviewed, Montoya can be seen displaying guns. In one photo, he is with two men on a city street, while in the other he is making a hand sign and the person he is with is wearing a red bandana. In the Oakland area, it is very common for gang members to pose in photos with guns and red bandanas to promote gang affiliation and intimidate or strike fear in the community and rival gang members. The red bandana is one of the strongest symbols of the Norteño gang because everyone on the streets of Oakland knows what it means. Instilling fear is how each gang controls turf. As Sergeant Keely explained, "[y]ou know that they have guns. You know they're ruthless. You know that they will shoot you. Oakland is famous for snitches getting stitches and those kinds of reputation that they put out there, that if you tell the police, hey, these guys are doing criminal activity, you have to fear that these people are going to shoot you the second the police drive off the block." In gang culture guns are "the tool of the trade" and "the ultimate power. You kill. You don't have to have overwhelming strength, everything like that. It's fear and intimidation." Gang members collectively own guns and commonly pass guns around from member to member. In Oakland, if two or more gang members are together, it is common for at least one of them to be carrying a gun.

Upon a search of the bedroom in Fowler-Scholz's house, which Montoya lived in for several months before the murder, officers found paperwork appearing to belong to him; however, they also found items appearing to belong to "Jessie Yanez." Officers also found multiple items of clothing in varying sizes with red as a main color, which is common among Norteño gang members. They discovered a notebook with drawings of women and eight pages of innocuous notes, including one instance of the term "Norte" written inside. The notebook also had "Jessie Yanez" written in it.

C

*Benefit Of A Criminal Street Gang*

In Detective Sample's opinion defendants committed the shooting at the sports bar for the benefit of the Norteño criminal street gang. "This is a very violent crime, a shooting, murder, and multiple people being shot, a very violent crime. And when Norteño members are involved in a crime like this, it enhances their reputation for violence, making them more feared by their rivals, enemy gangs, as well as any communities that these Norteño gang members occupy. That reputation for violence benefits them by making them more feared by all those individuals, but it also prevents oftentimes additional crimes from being reported by these Nor -- by these Norteño gangs. When these Norteño gangs commit additional crimes, people use this reputation for violence to decide I don't want to testify against these guys because these guys are very violen[t]."

Further, defendants committed the assault and shooting in response to a perceived act of disrespect. Disrespect, in the gang culture, is met with a swift response that is "oftentimes harsh violence." "It's sort of a one-up kind of situation. If you call me a name, I'm gonna

8

pull out a weapon and use my weapon to show you ... that you will respect me."

The fact that Fowler-Scholz wore a red shirt beneath his white sweatshirt during the shooting functioned to identify him as a gang member who needed to be feared. "Wearing those colors during the commission of a crime like this, you're sort of taking on that identification of Norteños being responsible for this particular crime." Additionally, Fowler-Scholz flashed his SACRA tattoo multiple times, "showing who [he is] affiliated with ... showing pride in [his] gang. Especially a tattoo this size, that's pretty big tattoo with five letters. It shows where [his] heart's at ... what [his] affiliations with." Detective Sample explained, "it's another form of communication of who's responsible for this particular crime, Varrio Diamonds Sacra in this particular case and an inference to that particular subset." It is common for gang members to boast about the area they are from to nongang members because the goal is to show pride in affiliation.

It is also common for members of different Norteño subsets to commit crimes together. "[The] Norteno [g]ang is connected on many bases, through neighborhoods, through families, through the prison system. [¶] The structure of the Norteno [g]ang as it relates to the prison gangs is still very strong with the Nuestra Familia, and Norteños still have many bonds and still have many communications with one another. [¶] The Nuestra Familia and Northern Structure still set up regiments or groups from the Nuestra Familia basically directing Norteno groups to sell narcotics, to commit assaults, various activities. [¶] And these are investigations that I've participated in to witness these particular regiments being set up in -- here in Sacramento on multiple occasions. [¶] So the connection goes to -- from the high prison system, down to the street prison system, and even further past that to smaller subsets. [¶] So these particular individuals have lots of connections coming from various sources."

It is also common for a Norteño who comes to a new town to start associating with a Norteño subset based in the new town. For example, Detective Sample investigated a case involving Jorge Castaneda who moved to Sacramento from Vacaville where he was a Norteño gang member. Upon moving to Sacramento, Castaneda began to associate with the Westgate Norteños from the Natomas area and committed the murder of a Sureño gang member with that gang. Similarly, after Montoya moved to Sacramento, he moved into a house with Fowler-Scholz, a Varrio Diamond Sacra member. To Detective Sample, this showed Montoya intended to continue his affiliation and involvement with the Norteño gang because he sought out the company of Norteño gang members.

(ECF No. 17-5 at 20–28; Montoya, 2019 WL 2353014, at *10–14.)

9

1    **II.    Procedural Background**

2        **A.   Judgment**

3        The court found petitioner guilty of two counts of second-degree murder, one count of

4    attempted murder in second-degree, one count of assault with a firearm, and one count of assault

5    with a deadly weapon, but it also found the gun allegations were not true. (ECF No. 17-1.) The

6    trial court imposed an aggregate prison term of 142 years. (Id.; ECF No. 17-5 at 33–34.)

7        **B.  State Appeal and Federal Proceedings**

8        Petitioner timely appealed his convictions, contending that (1) the court erred by admitting

9    dissimilar and prejudicial prior incidents, and (2) there was insufficient evidence to support a

10   common plan for the initial assault or foreseeability of the shooting. (ECF No. 17-2.) As to the

11   first claim, the appellate court agreed that it erred in admitting one of the three prior incidents, but

12   the error was harmless. (ECF No. 17-5 at 4.) The appellate court rejected his claim that

13   insufficient evidence supported his convictions based on the natural and probable consequences

14   doctrine. (Id.) Petitioner sought review in the California Supreme Court. (ECF No. 17-6.) On

15   September 11, 2019, the California Supreme Court summarily denied review. (ECF No. 17-7.)

16   Petitioner did not seek state habeas corpus relief.

17       The present petition was filed on October 21, 2019. (ECF No. 1.) Respondent has filed an

18   answer. (ECF No. 16.) Petitioner subsequently filed a traverse. (ECF No. 18.)

19       **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

20       A court can entertain an application for a writ of habeas corpus by a person in custody

21   under a judgment of a state court on the ground that he is in custody in violation of the

22   Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not

23   available for an alleged error in the interpretation or application of state law. See Wilson v.

24   Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Park v.

25   California, 202 F.3d 1146, 1149 (9th Cir. 2000) (stating that "a violation of state law standing

26   alone is not cognizable in federal court on habeas.").

27       This court may not grant habeas corpus relief unless the adjudication of the claim:

28

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). But it may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam) (citing Parker v. Matthews, 567 U.S. 37 (2012)); see also Carey v. Musladin, 549 U.S. 70, 76–77 (2006). Nor may circuit precedent be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Marshall, 569 U.S. at 64.

A habeas corpus application can invoke § 2254(d)(1) in two ways. First, a state court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts a holding of the Supreme Court or reaches a different result from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405–06). Second, "under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 120 S. Ct. at 1522; see also Schriro v.

Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 786–87.

This court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome if "there is reason to think some other explanation for the state court's decision is more likely." Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision rejects some of petitioner's claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply, and a federal habeas court reviews the claim de novo. Stanley, 633 F.3d at 860.

## ANALYSIS

Petitioner asserts one ground for relief; that there is insufficient evidence to support his convictions under a theory of aiding and abetting liability. (ECF No. 1 at 5.) Specifically, he

1  argues that there was insufficient evidence of a common plan to commit the initial assault against

2  Cordova. He also contends that Montoya's shooting spree was not a reasonably foreseeable result

3  of the fight with Cordova. (ECF No. 1 at 31–38.)

4      **A. State Court Opinion**

5      Petitioner raised this claim in his direct appeal. In the last reasoned state court decision,

6  the California Court of Appeal considered and rejected the claim:

> *Sufficient Evidence Supports Fowler-Scholz's Guilt On An Aider*
> *And Abettor Theory*
>
> Fowler-Scholz contends there was insufficient evidence to support
> his convictions for murder, attempted murder, and assault with a
> firearm because no evidence showed these offenses were the
> foreseeable product of a common plan to commit the target offense -
> - an assault on Cordova. We disagree.
>
> " '[S]ection 31, which governs aider and abettor liability, provides in
> relevant part, "All persons concerned in the commission of a crime,
> whether it be felony or misdemeanor, and whether they directly
> commit the act constituting the offense, or aid and abet in its
> commission ... are principals in any crime so committed." An aider
> and abettor is one who acts "with knowledge of the criminal purpose
> of the perpetrator *and* with an intent or purpose either of committing,
> or of encouraging or facilitating commission of, the offense."
> [Citations.]' '[A] person who aids and abets the commission of a
> crime is a "principal" in the crime, and thus shares the guilt of the
> actual perpetrator.' ...
>
> "An aider and abettor is guilty not only of the intended, or target,
> crime but also of any other crime a principal in the target crime
> actually commits (the nontarget crime) that is a natural and probable
> consequence of the target crime. [Citations.] 'Thus, for example, if a
> person aids and abets only an intended assault, but a murder results,
> that person may be guilty of that murder, even if unintended, if it is
> a natural and probable consequence of the intended assault....'
>
> "A consequence that is *reasonably foreseeable* is a natural and
> probable consequence under this doctrine. 'A nontarget offense is a
> " 'natural and probable consequence' " of the target offense if, judged
> objectively, the additional offense was reasonably foreseeable.
> [Citation.] The inquiry does not depend on whether the aider and
> abettor actually foresaw the nontarget offense. [Citation.] Rather,
> liability " 'is measured by whether a reasonable person in the
> defendant's position would have or should have known that the
> charged offense was a reasonably foreseeable consequence of the act
> aided and abetted.' " [Citation.] Reasonable foreseeability "is a
> factual issue to be resolved by the [trier of fact]." ' " (*People v. Smith*
> (2014) 60 Cal.4th 603, 611.)
>
> "In the context of murder, the natural and probable consequences

13

doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors -- to deter them from aiding or encouraging the commission of offenses -- is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder." (*People v. Chiu* (2014) 59 Cal.4th 155, 165.) "[P]unishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id.* at p. 166.)

As an initial matter, we address Fowler-Scholz's argument the law required the prosecutor, in addition to proving the foreseeability of the nontarget offense, to prove defendants acted with a common plan to commit the target offense of assault on Cordova. This argument was rejected by our Supreme Court in *Smith*. "To establish aiding and abetting liability under the natural and probable consequence doctrine, the prosecution must prove the nontarget offense was reasonably foreseeable; it need not *additionally* prove the nontarget offense was not committed for a reason independent of the common plan to commit the target offense." (*People v. Smith*, *supra*, 60 Cal.4th at p. 614.) If the prosecutor had to also prove defendants acted pursuant to a common plan that "would mean that a nontarget offense, even if reasonably foreseeable, is not the natural and probable consequence of the target offense if the jury finds it was committed for a reason independent of the common plan to commit the target offense...." (*Ibid.*) "Because the aider and abettor is furthering the commission, or at least attempted commission, of an actual crime, it is not necessary to add a limitation on the aider and abettor's liability for crimes other principals commit beyond the requirement that they be a natural and probable, i.e., reasonably foreseeable, consequence of the crime aided and abetted." (*Id.* at pp. 616-617.)

"To be sure, whether an unintended crime was the independent product of the perpetrator's mind outside of, or foreign to, the common design may, if shown by the evidence, become *relevant* to the question whether that crime was a natural and probable consequence of the target crime. In a given case, a criminal defendant may argue to the jury that the nontarget crime was the perpetrator's independent idea unrelated to the common plan, and thus was *not* reasonably foreseeable and *not* a natural and probable consequence of the target crime. But that would be a factual issue for the jury to resolve [citation], not a separate legal requirement." (*People v. Smith*, *supra*, 60 Cal.4th at p. 617.)

Regardless, there was evidence of a common plan to assault Cordova. After Amber told Fowler-Scholz that Cordova spilled his drink on her, Fowler-Scholz asked her whether she wanted him to punch Cordova. After Amber said yes, Fowler-Scholz, Montoya, and Amber walked over to where Cordova was standing. After a verbal altercation that also included Montoya, Fowler-Scholz hit Cordova with a beer bottle. A fact finder could reason from this evidence that

14

defendants, having been told to assault Cordova, formed a common plan to assault him that they carried out together by walking to Cordova and initiating a verbal and physical altercation.

The record as a whole also provides sufficient evidence from which a reasonable trier of fact could have found the nontarget offenses of murder, attempted murder, and assault with a firearm were natural consequences of the planned assault on Cordova. Although the court found the shooting was not a gang shooting within the meaning of the gang statute, ample evidence showed both Fowler-Scholz and Montoya were extensively involved in Norteño gangs. The gang experts testified about the importance of guns within the gang culture and that it is extremely common for gang members to either be armed or be in a group where at least one person is armed. Guns are treated as property of the gang, and not a single member, and guns are often shared among multiple people. The person who usually is tasked with carrying a weapon for a group of gang members is the person with the lowest risk of being found with a gun, or the person with the lowest risk of criminal liability in the event he or she is caught with a gun. Further, acts of violence are particularly common from gang members if that gang member believes he has been disrespected. The evidence also showed defendants lived together for months before the shooting and had a relationship that went beyond being roommates and included social interactions. A gun holster was also found in the house defendants shared, although no guns or ammunition were recovered.

From this evidence, the trier of fact could reason that Fowler-Scholz, having lived and associated with Montoya for an extended amount of time, knew Montoya identified with and subscribed to gang values. Montoya had a gang-related tattoos and possessed gang clothing, things Fowler-Scholz would have come in contact with while living with Montoya. Given Fowler-Scholz's extensive history with gangs, it can be inferred he also knew what those gang values were, even if he did not personally subscribe to them. The fact finder could reasonably infer from this evidence that Fowler-Scholz knew Montoya would act in a "harsh[ly] violent" way when presented with a perceived act of disrespect. As Detective Sample testified, "[i]t's sort of a one-up kind of situation. If you call me a name, I'm gonna pull out a weapon and use my weapon to show you ... that you will respect me." This is exactly what Fowler-Scholz did when responding to an act of disrespect by hitting Cordova on the head with a beer bottle and what Montoya did when escalating the assault to a public shooting.

The trier of fact could also reasonably infer Fowler-Scholz knew Montoya was armed when the men confronted Cordova and Fowler-Scholz initiated the assault. A gun holster was found in defendants' home, suggesting a gun was at some point also in the home. Detective Sample and Sergeant Keely testified it was common for gang members to share ownership of a gun and for only one person to be armed when out in public with a group of gang members. Indeed, Fowler-Scholz had been documented in the past sharing guns with fellow Norteño gang members while on social outings. Given the indicia of gun ownership and Detective Sample's testimony, it is

reasonable to infer that the gun Montoya possessed was the gun he and Fowler-Scholz shared. Further, because Montoya had a minor criminal history when compared to Fowler-Scholz, it was likely the two decided Montoya would carry the gun on the night of the shooting to avoid detection as Detective Sample testified was common among Norteño gang members.

Fowler-Scholz argues these inferences are not reasonable because the shooting was not a gang-related shooting. Like the trial court, we agree that the shooting was not strictly gang related. But just because this shooting was not gang related within the meaning of the gang statute, does not mean the gang evidence was irrelevant and cannot be used to inform the trier of fact about what is reasonably foreseeable under the circumstances of Fowler-Scholz's case. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 ["Evidence of the defendant's gang affiliation -- including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like -- can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime"].) Because the evidence established Fowler-Scholz likely knew Montoya was armed and would respond to an act of disrespect with harsh violence, sufficient evidence proved the murders, attempted murder, and assault with a deadly weapon were natural and probable consequences of Fowler-Scholz's assault on Cordova.

(ECF No. 17-5 at 47–51; Montoya, 2019 WL 2353014, at *23–25.)

## B. Discussion

A petitioner is entitled to habeas corpus relief on a sufficiency of the evidence claim "if it is found that upon the record adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979); see also Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). If there are conflicting factual inferences, the federal habeas court must presume the jury resolved the conflicts in favor of the prosecution. Jackson, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of prosecution, and must defer to that resolution."); McDaniel v. Brown, 558 U.S. 120, 133 (2010) (per curiam).

Although this court's review is grounded in due process under the Fourteenth Amendment, the Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16; Juan H. v. Allen, 408 F.3d 1262, 1275–76 (9th Cir. 2005). This court will look to state law to establish the

16

1    elements the offense and then turn to the federal question of whether the state court was

2    objectively unreasonable in concluding that sufficient evidence supported that conviction. See

3    Johnson v. Montgomery, 899 F.3d 1052, 1056 (9th Cir. 2018).

4          "After AEDPA, we apply the standards of *Jackson* with an additional layer of deference."

5    Juan H., 408 F.3d at 1274; see Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). On

6    direct appeal at the state level, "it is the responsibility of the jury—not the court—to decide what

7    conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the

8    jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

9    agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam). On habeas review, "a

10   federal court may not overturn a state court decision rejecting a sufficiency of the evidence

11   challenge simply because the federal court disagrees with the state court. The federal court

12   instead may do so only if the state court decision was 'objectively unreasonable.'" Id. (quoting

13   Renico v. Lett, 559 U.S. 766, 773 (2010)).

14         Here, petitioner was charged and convicted under a theory of aiding and abetting.

15   California law states that "'a person aids and abets the commission of a crime when he or she,

16   acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or

17   purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or

18   advice aids, promotes, encourages or instigates, the commission of the crime.'" Juan H., 408 F.3d

19   at 1276 (citing People v. Beeman, 35 Cal. 3d 547, 561 (1984)). Under the natural and probable

20   consequences doctrine, a defendant may also be liable for a perpetrator's nontarget offense if the

21   trier of fact finds two additional elements: (4) that the perpetrator committed a nontarget offense,

22   and (5) the nontarget offense was a "'natural and probable consequence' of the target crime that

23   the defendant assisted or encouraged." People v. Prettyman,14 Cal. 4th 248, 254, 262 (1996).

24   "[P]resence at the scene of the crime, companionship, and conduct before and after the offense"

25   are relevant to determining whether a defendant aided and abetted a crime. People v. Campbell,

26   25 Cal. App. 4th 402, 409 (1994) (citation omitted); see also People v. Miranda, 192 Cal. App.

27   4th 398, 408 (2011) ("The defendant's knowledge that an act which is criminal was intended, and

28   his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose

1  liability on him for any reasonably foreseeable offense committed as a consequence by the
2  perpetrator.")

3          **1. Common Plan**

4        To start, petitioner claims that his convictions for second-degree murder, attempted
5  murder, and assault with a firearm (nontarget offenses) cannot stand because he had no common
6  plan with Montoya to assault Cordova (target offense). He argues that the relevant into inquiry is
7  "whether he planned to commit the assault with Montoya" and contends that the appellate court
8  misread People v. Smith, 60 Cal. 4th 603 (2014) to discard the element of a common plan. (ECF
9  No. 1 at 27, 34.)

10       This argument fails because it misstates California law. In Smith, the California Supreme
11 Court clarified that "[t]o establish aiding and abetting under the natural and probable consequence
12 doctrine, the prosecution must prove the nontarget offense was reasonably foreseeable." Smith,
13 60 Cal. 4th at 617. It reiterated that "[the prosecution] need not *additionally* prove the nontarget
14 offense was not committed for a reason independent of the common plan to commit the target
15 offense." Id. at 613–14. Although the element of a common plan applies in conspirator liability, it
16 does not apply to an aider and abettor. Id. at 616. "Because the aider and abettor is furthering the
17 commission, or at least attempted commission, of an actual crime, it is not necessary to add a
18 limitation on the aider and abettor's liability for crimes other principals commit beyond the
19 requirement that they be a natural and probable, i.e., reasonably foreseeable, consequence of the
20 crime aided and abetted." Id. at 616–17. Because the prosecutor did not have to prove a common
21 plan for aiding and abetting liability under California law, petitioner cannot succeed on this claim.

22       But even assuming that a common plan was a requirement for an aiding and abetting
23 conviction, there was sufficient evidence of a common plan to assault Cordova. The record shows
24 that Amber was upset that Cordova spilled a drink on her and told petitioner about the incident.
25 (ECF No. 17-13 at 252, 324; ECF No. 17-14 at 166–67.) Petitioner asked Amber if she wanted
26 him to go punch somebody, and Amber said yes. (ECF No. 17-14 at 166–67.) Petitioner turned
27 around and walked over to Cordova, with Montoya and Amber following single file behind him.
28 (ECF No. 17-13 at 329; ECF No. 17-14 at 167, 178.) Petitioner approached Cordova, verbally

confronted him about disrespecting Amber, threw a beer bottle at his head, and started fighting him. (ECF No. 17-13 at 312–13; ECF No. 17-14 at 328–333.) In light of this evidence, a rational trier of fact could conclude that petitioner and Montoya formed a common plan to assault Cordova and implemented this plan by confronting him inside the bar.

### 2. Natural and Probable Consequence

Petitioner also argues his aiding and abetting convictions cannot stand because Montoya's shooting was not a natural and probable consequence of his confrontation with Cordova. (ECF No. 1 at 35.)

For the natural and probable consequences doctrine to apply, "it is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act." People v. Nguyen, 21 Cal. App. 4th 518, 531 (1993). "[C]onsideration is not restricted to the circumstances prevailing prior to or at the commencement of the endeavor, but must include all of the circumstances leading up to the last act by which the participant directly or indirectly aided or encouraged the principal actor in the commission of the crime." Id. at 532. It does not matter whether petitioner foresaw the nontarget offense; liability is measured by whether a reasonable person in his position would or should have known that the nontarget offense was a reasonably foreseeable consequence of the target act. Smith, 60 Cal. 4th at 611. This is a factual question to be resolved by the trier of fact. See, e.g., Id.; Beeman, 35 Cal. 3d at 561–63.

Here, it was reasonable for the state appellate court to conclude that there was sufficient evidence that the nontarget offenses were a natural and probable consequence of petitioner's assault of Cordova.[1] There was ample evidence that both petitioner and Montoya adhered to the gang values. At trial, gang experts Detective Sample and Sergeant Keely concluded that petitioner is a member of the Varrio Diamonds Sacra Norteños street gang and that Montoya is a member of the 27th Street East Oakland subset of Norteños. (ECF No. 17-14 at 172–73; ECF No. 17-15 at

---

[1] The appellate court correctly noted that, although the offenses are not strictly gang-related, evidence of Montoya and petitioner's gang affiliations could be used to prove other issues pertaining to guilt. See People v. Hernandez, 33 Cal. 4th 1040, 1049 (2004); see also Rodarte v. Ducart, No. CV 15-2244-JFW (PLA), 2015 WL 9914180, at *8 (C.D. Cal. Nov. 2, 2015).

34–38, 279–87; ECF No. 17-16 at 9–13.) Petitioner and Montoya lived together in Sacramento for six months prior to the incident. (ECF No. 17-13 at 226.) Detective Sample testified that it is not uncommon for a gang member to continue affiliating with the gang after moving to a new city, like Montoya did. (ECF No. 17-16 at 16.) Petitioner and Montoya's residence contained items commonly used to show gang affiliation and an empty gun holster. (ECF No. 17-14 at 109; ECF No. 17-15 at 28, 118, 292–303; ECF No. 17-16 at 4–10, 13–15.) On the night of the incident, Fowler-Scholz was wearing red, a color commonly worn by Norteño gang members, and was flashing his gang-related tattoos. (ECF No. 17-14 at 162–66; ECF No. 17-15 at 286–88.)

Experts also testified that gang members use violence to obtain respect through fear and intimidation. (ECF No. 17-15 at 57, 62; ECF No. 17-16 at 20–22.) Both Detective Sample and Sergeant Keely discussed that guns are the tool of the trade for gangs and the most efficient way to get a reputation for violence. (ECF No. 17-15 at 62, 275; ECF No. 17-16 at 20.) When gang members hang out in public, a younger Norteño gang member with less exposure to prison time usually carries a gun. (ECF No. 17-15 at 276.) Guns typically belong to the gang and are shared among its members. (ECF No. 17-15 at 62–63.) Detective Sample testified that any kind of disrespect to a gang member is oftentimes met quickly with harsh violence. (ECF No. 17-16 at 21.)

Based on the evidence, a reasonable trier of fact could have inferred that Montoya and petitioner adhered to the same gang values, would likely respond to disrespect with harsh violence, and that Montoya was carrying the gun from their residence that evening. Although "the State's case here relied heavily on circumstantial evidence, and that this evidence may have supported inferences other than those the [trier of fact] drew," petitioner has not met high threshold required by AEDPA. See Fuentes v. Gonzalez, 457 F. App'x 695, 697–98 (9th Cir. 2011). This court cannot conclude that no reasonable jurist could agree with the appellate court's finding that the nontarget offenses were a natural and probable consequence of petitioner's assault of Cordova.

1

### 3. Sequence of Events

2  Lastly, petitioner argues that he could not have aided and abetted the nontarget offenses

3 because they occurred *after* he threw a beer bottle at Cordova and while he was "wrapped in a

4 'bear-hug'" with Cordova. (ECF No. 1 at 39.) This claim fails because it is based on a

5 misunderstanding of the law. California has abolished the distinction made between perpetrators

6 and aider and abettors at common law. People v. Olguin, 31 Cal. App. 4th 1355, 1376 (1994)

7 (citing Bompensiero v. Superior Court, 44 Cal. 2d 178, 186 (1955)). "Both the perpetrator and the

8 aider and abettor are principals, and *all* principals are liable for the natural and foreseeable

9 consequences of their crimes." Id. Petitioner, like a defendant in Olguin, conceded that he

10 instigated the fight; the only unresolved question for his liability was whether the shooting was a

11 natural and probable consequence of the fight. Id. That is a factual question that the trier of fact

12 resolved by reaching a guilty verdict.

13  This court concludes that the state appellate court did not unreasonably apply federal law

14 in affirming petitioner's convictions and recommends denying relief on his claim.

15

### CONCLUSION

16  Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state

17 court decision on any claim was contrary to or an unreasonable application of clearly established

18 law as determined by the Supreme Court, or resulted in a decision based on an unreasonable

19 determination of the facts.

20  Further, it is RECOMMENDED that petitioner's petition for a writ of habeas corpus (ECF

21 No. 1) be denied.

22  These findings and recommendations will be submitted to the United States District Judge

23 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days

24 after being served with these findings and recommendations, any party may file written

25 objections with the court and serve a copy on all parties. The document should be captioned

26 "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

27 shall be served on all parties and filed with the court within seven (7) days after service of the

28 objections. Failure to file objections within the specified time may waive the right to appeal the

District Court's order. <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. <u>See</u> Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Furthermore, Hunter Angelea was previously named as the respondent. Patrick Eaton is currently the warden of Sierra Conservation Center, where petitioner is incarcerated. "A petitioner for habeas corpus relief must name the state officer having custody of him or her as the respondent to the petition." <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir.1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254). Accordingly, the court GRANTS respondent's request to substitute Patrick Eaton as respondent in this matter.

Dated:  October 11, 2021

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE